**BRYAN CAVE LLP**
By: Robert A. Wolf (RW 3419)
    Omar A. Shakoor (OS 4913)
1290 Avenue of the Americas
New York, New York 10104
(212) 541-2000
*General Counsel to Plaintiff Robert L. Geltzer,*
*as Successor Chapter 7 Trustee of M. Silverman Laces, Inc.*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

```
– – – – – – – – – – – – – – – – – – – – – – – – – – x
In re:                                              :   Chapter 7
                                                    :
M. SILVERMAN LACES, INC.,                           :   Case No. 97-43223 (RDD)
                                                    :
                        Debtor.                     :
                                                    :
                                                    :
– – – – – – – – – – – – – – – – – – – – – – – – – – x
ROBERT L. GELTZER, as Successor Chapter 7           :
Trustee to CARLOS CUEVAS, as Successor Chapter      :
7 Trustee to SARAH C. LICHTENSTEIN, as Chapter      :
7 Trustee of the Estate of M. SILVERMAN LACES,      :   Adv. Proc. No. 99-8600A
INC.,                                               :
                                                    :
                        Plaintiff,                  :
                                                    :
    -against-                                       :
                                                    :
HOWARD BLOOM, LEONARD EDELSON,                      :
ACHILLE GAETANO, ALL LACE PROCESSING                :
CORPORATION f/k/a ALL LACE CORPORATION,             :
and WESTCHESTER LACE CORPORATION,                   :
                                                    :
                        Defendants.                 :
– – – – – – – – – – – – – – – – – – – – – – – – – – x
```

## PLAINTIFF-SUCCESSOR TRUSTEE'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure

("Bankruptcy Rules"), and Rule 52 of the Federal Rules of Civil Procedure ("Federal Rules")

made applicable thereby, Plaintiff Robert L. Geltzer, as Successor Chapter 7 Trustee (the

"Successor Trustee" or "Plaintiff") of M. Silverman Laces, Inc. (the "Debtor"), by his

undersigned General Counsel, respectfully submits the following proposed Post-Trial Findings of Fact and Conclusions of Law in connection with the trial of the above-captioned adversary proceeding against the remaining defendants therein, Leonard Edelson and Westchester Lace Corporation, which was held before the Honorable Robert D. Drain on February 28, 29 and March 3, 2008 (the "Trial").

## PROPOSED FINDINGS OF FACT

## I.   PROCEDURAL BACKGROUND[1]

1.   The Debtor's bankruptcy case commenced on May 14, 1997 (the "Petition Date"), on which date an involuntary petition was filed against the Debtor under Chapter 7 of the Bankruptcy Code.

2.   On or about June 19, 1997, Sarah C. Lichtenstein was appointed interim Chapter 7 Trustee of the Debtor pursuant to 11 U.S.C. § 701, and thereafter qualified as trustee (the "Original Trustee") pursuant to 11 U.S.C. § 702(d) and by operation of law.

3.   On or about September 10, 1999, the Original Trustee filed the Complaint commencing this adversary proceeding (the "Adversary Proceeding"). (Joint Exhibit V.)[2] Defendants Leonard Edelson ("Edelson") and Westchester Lace Corporation ("Westchester Lace") filed their answer on or about November 4, 1999. (Joint Exhibit VI.)

---

[1]   The Court may take judicial notice of the facts recited in this Section I.

[2]   Citations denoted as "Joint Exhibit ___" with a Roman numeral designation refer to the Joint Exhibits admitted into evidence at the Trial. Citations denoted as "Exhibit P___" with an Arabic numeral designation refer to the Plaintiff's Exhibits admitted into evidence at the Trial. Citations denoted as "Exhibit D___" refer to the Defendants' Exhibits admitted into evidence at the Trial.

4.      On or about February 1, 2000, Sarah C. Lichtenstein ceased to be the Original Trustee of the Debtor, and Carlos J. Cuevas was appointed successor trustee (the "Prior Successor Trustee"). On or about January 23, 2004, an order was entered in this case removing the Prior Successor Trustee as successor trustee, and on or about January 27, 2004, the Plaintiff was appointed by the Office of the United States Trustee as Successor Trustee, duly qualified, and is now acting in that capacity.

5.      By order dated June 29, 2006, this Court approved settlements between the Successor Trustee and certain defendants, such that defendants Edelson and Westchester Lace are the only remaining defendants in the Adversary Proceeding (the "Remaining Defendants").

6.      This Court held the Trial of this Adversary Proceeding against the Remaining Defendants on February 28, 29, and March 3, 2008.

## II.     BACKGROUND OF THE DEBTOR

7.      During the five-year period preceding the Petition Date, the Debtor was engaged in the business of the wholesaling and converting of lace products. (Tr3 at p. 119, lines 21-24; Gaetano Decl., ¶ 4.)[3]

---

[3]     Citations to "Tr. at p. __" refer to the transcript of February 28, 2008, the first day of the Trial. Citations to "Tr2 at p. __" refer to the transcript of February 29, 2008, the second day of the Trial. Citations to "Tr3 at p. __" refer to the transcript of March 3, 2008, the third day of the Trial. Citations to "Gaetano Decl." refer to the direct testimony of Achille Gaetano, set forth in the Declaration of Achille Gaetano, sworn to on February 21, 2008, and submitted in support of the Remaining Defendants' case.

8. The Debtor would purchase greige goods from third parties, have them dyed, finished and cut, and then resell them to jobbers, retailers and other customers. (Tr3 at p. 101, line 23 -p. 103, line 2; Gaetano Decl., ¶ 4.)

9. The Debtor also purchased finished goods from lace companies for resale to customers. (Gaetano Decl., ¶ 4.)

10. The Debtor's business was located at 8101 Tonnelle Avenue, North Bergen, New Jersey (the "Debtor's Premises"), where it remained until in or about early May, 1997. (Tr3 at p. 161, line 18 -p. 162, line 24.)

11. From 1992 through December 31, 1995, the Debtor had two shareholders, Achille Gaetano ("Gaetano") and Alvin Bloom ("Bloom"). (Exhibit P3, Gaetano Depo 1, p. 27, line 22 -p. 31, line 6.)[4]

## III. THE MISAPPROPRIATION BY EDELSON AND WESTCHESTER LACE OF THE DEBTOR'S BUSINESS AND ASSETS

12. At all times relevant to the Adversary Proceeding, Westchester Lace was in the business of knitting raw materials into greige goods, dyeing and finishing them, and scalloping, packing and shipping the finished lace products to customers. It also purchased

---

[4] Gaetano's deposition in the Adversary Proceeding was conducted over three days: August 31, 2000 ("Gaetano Depo 1"); September 26, 2000 ("Gaetano Depo 2"); and November 2, 2000 ("Gaetano Depo 3") (collectively, the "Gaetano Depos"). Each of the excerpts from the Gaetano Depos that are cited herein have been previously designated by the Successor Trustee. However, for ease of reference, citations are made to the full transcripts of the Gaetano Depos, which were submitted as Plaintiff's Exhibits.

greige goods from third parties, and dyed and finished those greige goods for resale to customers. (Edelson Decl., ¶ 14.)[5]

13. Edelson purchased the assets of Westchester Lace in 1976, becoming its President and one hundred percent (100%) shareholder. (Exhibit P2, Edelson Depo 2, at p. 187, line 19 -p. 189, line 23.)[6]

14. Edelson has remained Westchester Lace's President and sole shareholder continuously since 1976. (Tr3 at p. 131, lines 7-14; Exhibit P2, Edelson Depo 2, at p. 187, line 19 -p. 189, line 23.)

## A. **Edelson was a Principal of Both Westchester Lace and the Debtor**

15. As of January 1, 1996, Edelson also became an officer, director and fifty percent (50%) shareholder of the Debtor. (Tr3 at p. 27, line 13 -p. 28, line 5; Tr3 at p. 131, lines 15-22; Edelson Decl., ¶¶ 26, 40, 42; Plotzker Aff., ¶ 27; Exhibit P1, Edelson Depo 1, at p. 26, line 23 -p. 27, line 6.)[7]

16. Thus, from January 1996, through and including June 18, 1997, the date upon which the order for relief was entered in this bankruptcy case (the "Order for Relief Date"),

---

[5] Citations to "Edelson Decl." refer to the Declaration of Leonard Edelson, sworn to on February 21, 2008, and submitted in support of the Remaining Defendants' case.

[6] Edelson's deposition in the Adversary Proceeding was conducted over two days: June 26, 2001 ("Edelson Depo 1"); and June 1, 2006 ("Edelson Depo 2") (collectively, the "Edelson Depos"). Each of the excerpts from the Edelson Depos that are cited herein have been previously designated by the Successor Trustee. However, for ease of reference, citations are made to the full transcripts of the Edelson Depos, which were submitted as Plaintiff's Exhibits.

[7] Citations to "Plotzker Aff." refer to the Direct Testimony of Andrew W. Plotzker, sworn to on February 21, 2008, and submitted in support of the Successor Trustee's case.

throughout which period Edelson was a principal of both the Debtor and of Westchester Lace, (Tr3 at p. 131, lines 7-22), the Debtor was insolvent continuously (See ¶¶ 87-109, infra)

### B. The Lace Industry Began to Decline in 1995

17.     Beginning in 1995 and continuing continually thereafter, lace textile manufacturers in the United States like Westchester Lace were experiencing a significant decline, as lace and fabric garments were being manufactured with cheaper labor in such places as Asia, forcing many of Westchester Lace's customers out of business (the "Decline"). (Tr. at p. 163, lines 6-15; Exhibit P1, Edelson Depo 1, at p. 122, line 24 -p. 123, line 13; Edelson Decl., ¶ 11.)

18.     As a result of the Decline, Westchester Lace's market became smaller and more competitive, which forced Westchester Lace to sell to its customers at lower prices. (Exhibit P1, Edelson Depo 1, at p. 125, line 9 -p. 125, line 15.)

19.     The decline in the industry is reflected in the financial statements of Westchester Lace, which show that while Westchester Lace's net sales for 1994 were approximately $27,533,000, they fell by more than six and a half percent (6.5%) to approximately $25,705,000 in 1995. (Exhibit P20A and Exhibit 20B; Exhibit P1, Edelson Depo 1, at p. 121, line 4 -p. 122, line 23.)

20.     In 1996, as a result of the continued decline in the industry, Westchester Lace's net sales fell another twelve and a half percent (12.5%) to approximately $22,490,000. (Exhibit P20B; Exhibit P1, Edelson Depo 1, at p. 124, lines 12 -21.)

**C.** **Edelson Caused the Debtor to Retain Westchester Lace's and His Own Personal Accountants**

21.    The firm Schimel, Orenstein & Mazzei, P.A. ("Schimel P.A.") had been

Westchester Lace's accountants since at least 1992. (Tr3 at p. 143, line 22 -p. 145, line 7.)

22.    Schimel P.A. also had been Edelson's personal accountants since at least

1992. (Tr3 at p. 143, line 22 -p. 145, line 4.)

23.    Beginning in the year 1996, after Edelson became a principal of the

Debtor, he caused Schimel P.A. to become the Debtor's accountants, replacing Cole, Samsel &

Bernstein, LLC. (Tr3 at p. 31, line 14 -p. 32, line 17; Tr3 at p. 143, line 22 -p. 144, line 20.)

**D.** **In January 1997, While Edelson Was a Principal of Both Westchester Lace and the Debtor, Westchester Lace Stopped Selling Westchester Lace Goods to the Debtor for Resale to the Debtor's Customers, and Began Selling Westchester Lace Goods to the Debtor's Customers Directly**

24.    During the year 1996, the Debtor purchased Westchester Lace style goods

from Westchester Lace that the Debtor, in turn, resold to its customers at a profit. (Tr3 at p. 41,

line 17-p. 42, line 4.)

25.    Westchester Lace's 1996 sales of such Westchester Lace style goods to

the Debtor totaled $2,155,497, as disclosed by Westchester Lace's Financial Statements for the

years ended December 31, 1996 and 1997, in Item 7.C, at page 8 thereof. (Tr3 at p. 42, line 5 -p.

43, line 13; Exhibit P20C.)

26.    In the portion of the year 1997 that the Debtor remained in business,

however, Westchester Lace's sales of Westchester Lace style goods to the Debtor dramatically

decreased to the amount of $163,678. (Tr3 at p. 43, lines 13-19; Exhibit P20C.)

27.     During the same year, 1997, when such sales to the Debtor dramatically decreased by nearly $2 million, and at a time that Edelson was not only one hundred percent (100%) shareholder of Westchester Lace, but also a fifty percent (50%) shareholder and director of the Debtor, and, therefore, owed fiduciary duties to the Debtor, Westchester Lace generated $1,670,864 by selling, for its own benefit, such goods directly to the Debtor's customers, as revealed by Westchester Lace's General Ledger Trial Balance for the year 1997, at page 2 thereof. (Tr. at p. 207, line 21 -p. 209, line 14; Tr. at p. 142, line 4 -p. 145, line 3; Tr3, p. 135, line 5 -p. 137, line 11; Exhibit P13; Exhibit P38, denoted by the heading "Sales - MSL(WLI)" at the bottom third of the page.)

28.     Although the Debtor was only in business for roughly the first third of 1997, the 1997 figure as to Westchester Lace sales of its goods to the Debtor ($163,678) was significantly less than a third of the comparable 1996 sales figure ($2,155,497). (Tr3 at p. 45, lines 3-5.)

29.     Documentation prepared in or about September 1997 by Schimel P.A., accountants to Westchester Lace (and to the Debtor) in 1997, concerning Westchester Lace's sales for the year 1997 as of August 31, 1997, confirms that Westchester Lace's direct sales of Westchester Lace style goods to the Debtor's customers, reported under the heading "Sales - MSL(WLI)," were in the amount of $1,670,864. (Tr. at p. 207, line 21 -p. 209, line 14; Exhibit P13.)

30.     Anthony R. Romano, CPA ("Romano"), of Schimel P.A., authored handwritten notes on such documentation concerning the $1,670,864 figure (the "Handwritten Notes"), which Handwritten Notes he initialed. (Tr2 at p. 54, line 7 -p. 57, line 22.)

31.     Romano's Handwritten Notes explain that the $1,670,864 figure

represents sales to customers of the Debtor: "Per DS - this represents customers gone to Lace by

the merger." (Tr. at p. 210, lines 10-14; Exhibit P13.)

32.     Diana Steiner, the in-house controller for Westchester Lace at the relevant

time, is the individual referenced as "DS." (Exhibit P2, Edelson Depo 2, at p. 237, line 11 -

p. 239, line 11; Tr3 at p. 154, line 24 -p. 155, line 18.)

33.     These direct sales by Westchester Lace to customers of the Debtor began

after Edelson and Westchester Lace obtained the list of the Debtor's customers (the "Customer

List"). (Exhibit P18.)

34.     These direct sales by Westchester Lace to customers of the Debtor began

at a time when Edelson was both the President and sole shareholder of Westchester Lace and a

50% shareholder and director of the Debtor. (Tr. at p. 210, line 15 -p. 212, line 17.)


**E.     The Transfer of the Debtor's Offices and
Inventory to Westchester Lace's Premises Before the Petition Date**

35.     In or about May 1997, prior to the Petition Date, the Debtor moved out of

its own premises and moved its office space to the main Westchester Lace premises located at

3901 Liberty Avenue, North Bergen, New Jersey. (Tr3 at p. 69, line 10 -p. 70, line 3; Tr3 at

p. 132, line 6-p. 133, line 7; Exhibit P4, Gaetano Depo 2, at p. 191, line 18 -p. 193, line 19.)

(See also Exhibit P2, Edelson Depo 2, at p. 216, line 22 -p. 220, line 3.)

36.     Also, in or about May 1997, prior to the Petition Date, the Debtor's

inventory and office space was moved to Westchester Lace's nearby warehouse space. (Tr3 at

p. 161, line 18-p. 163, line 25; Exhibit P4, Gaetano Depo 2, at p. 191, line 18 -p. 193, line 19.)

(See also Exhibit P2, Edelson Depo 2, at p. 216, line 22 -p. 220, line 3.)

37.     The Debtor's goods were stored with inventory from Westchester Lace, distinguished only by the method in which they were stored -- boxes and cartons as opposed to the rolls used to store Westchester Lace inventory.  (Tr3 at p. 70, lines 6-13; Tr3 at p. 75, lines 7-14; Exhibit P2, Edelson Depo 2, at p. 218, line 19 -p. 219, line 16.)

## F.     Gaetano and Bloom Became Employees of Westchester Lace

38.     Within days after the Petition Date, Edelson hired Gaetano, who had been up to then the President and Chief Operating Officer of the Debtor, and Howard Bloom ("Bloom"), who had been up to then the Second Vice President, Secretary and Treasurer of the Debtor, as employees of Westchester Lace.  (Tr3 at p. 83, lines 20-25; Tr3 at p. 89, lines 3-8; Tr3 at p. 174, line 19 -p. 175, line 2; Exhibit P5, Gaetano Depo 3, at p. 264, line 19 -p. 269, line 24; and Exhibit P7.)  (See also Exhibit P1, Edelson Depo 1, at p. 92, line 16 -p. 94, line 21.)

39.     Prior to commencing employment for Westchester Lace, both Gaetano and Bloom had been physically working for the Debtor at the Westchester Lace premises.  (Tr3 at p. 174, lines 19 - 23.)

40.     Once he was employed by Westchester Lace, Bloom, who had been involved with sales for the Debtor, began performing similar sales functions for Westchester Lace, including the solicitation of former customers of the Debtor on behalf of Westchester Lace.  (Tr3 at p. 90, line 15 -p. 91, line 17; Tr3 at p. 175, lines 3-18.)

41.     In addition to Bloom, Edelson also hired up to three other salespersons from the Debtor to work for Westchester Lace within days of the Petition Date. (Tr3 at p. 84, line 21 -p. 85, line 24; Tr3 at p. 91, line 18 -p. 93, line 14; Tr3 at p. 175, line 19 -p. 176, line 3.)

### G.     Two Days After the Petition Date, Edelson and Westchester Lace Began Selling the Debtor's Inventory Directly

42.     On May 16, 1997, just two days after the Petition Date, Westchester Lace began directly selling the Debtor's inventory, that was being stored at its facility, to the Debtor's customers for Westchester Lace's own benefit. (Tr3 at p. 70, lines 14-22; Tr3 at p. 76, line 20 - p. 80, line 17; Exhibit D16.)

43.     That inventory of the Debtor was subject to a security interest that the Debtor had granted to Hudson United Bank ("HUB") in consideration for a $300,000 loan (the "Loan") by HUB to the Debtor. (Tr3 at p. 57, line 8 -p. 58, line 16; p. 59, line 20 -p. 61, line 10; Joint Exhibit XVII.)

44.     The Loan was made to the Debtor by HUB initially on or about September 19, 1995, and was personally guaranteed by Edelson, Gaetano and Bloom. (Joint Exhibit IX; Joint Exhibit X; Joint Exhibit XII; Tr3 at p. 48, line 21 -p. 49, line 24; p. 49, line 25 -p. 50, line 5; Tr3 at p. 50, lines 15-24.)

45.     The Loan was extended for a first time on December 22, 1995, which first extension was also personally guaranteed by Edelson and Gaetano. (Exhibit P8B; Exhibit P9; Exhibit P11; Tr3 at p. 48, line 21 -p. 49, line 24; p. 49, line 25 -p. 50, line 5; Tr3 at p. 50, lines 15-24.)

46. The Loan was extended for a second time on March 21, 1996, which second extension was also personally guaranteed by Edelson, Gaetano and Bloom. (Exhibit P8C; Exhibit P10; Exhibit P12; Tr3 at p. 48, line 21 -p. 49, line 24; p. 49, line 25 -p. 50, line 5; Tr3 at p. 50, lines 15-24.)

47. The Loan was extended for a third time on June 6, 1996, which third extension was also personally guaranteed by Edelson, Gaetano and Bloom. (Joint Exhibit XIX; Joint Exhibit XI; Joint Exhibit XIII; Tr3 at p. 48, line 21 -p. 49, line 24; p. 49, line 25 -p. 50, line 5; Tr3 at p. 50, lines 15-24.)

48. The Loan was extended for a fourth and final time on January 1, 1997, which fourth and final extension was also personally guaranteed by Edelson, Gaetano and Bloom. (Joint Exhibit XIV; Joint Exhibit XV; Joint Exhibit XVI; Tr3 at p. 48, line 21 -p. 49, line 24; p. 49, line 25 -p. 50, line 5; Tr3 at p. 50, lines 15-24.)

49. In addition to the Loan, Edelson, Gaetano and Bloom also guarantied other loan indebtedness of the Debtor to HUB. (Tr3 at p. 50, lines 6-10; Tr3 at p. 50, lines 15-24.)

50. As additional security for the indebtedness under the Loan, the Debtor entered into a security agreement, dated January 24, 1997, pledging all of its inventory to HUB. (Joint Exhibit XVII.)

51. Neither Edelson nor Westchester Lace ever applied for, nor did they ever obtain, the consent of the Bankruptcy Court to sell the Debtor's inventory. (Tr. at p. 203, lines 7-19; Tr3 at p. 151, line 1-p. 152, line 10.)

52. There was no written agreement among Westchester Lace, the Debtor and HUB permitting Westchester Lace to begin selling the Debtor's inventory on May 16, 1997. (Tr.

at p. 203, lines 16-19; Tr. at p. 205, line 24 -p. 206, line 10; Tr3 at p. 81, lines 4-8; p. 171, lines 5 -10.)

53.     Edelson testified that he did not recall notifying HUB that Westchester Lace had begun selling the Debtor's inventory. (Tr3 at p. 206, line 17 -p. 208, line 6.)

54.     After the Original Trustee was appointed on June 19, 1997, Edelson and Westchester Lace failed to advise her or her representatives that they had begun selling the Debtor's inventory on May 16, 1997. (Tr3 at p. 171, lines 11-18; p. 193, line 13 -p. 194, line 14.)

55.     HUB did not move to lift the automatic bankruptcy stay until on or about June 16, 1997, over one month after the Petition Date (the "Lift Stay Motion").

56.     The Lift Stay Motion was not granted until November 25, 1997. (Exhibit D7.)

57.     By the time the Lift Stay Motion was granted, Edelson already had caused Westchester Lace to sell off the bulk of Debtor's inventory that was subject to HUB's security interest. (Exhibit D16.)

58.     Among other things, Edelson caused Westchester Lace to sell the Debtor's inventory in order to ensure that Westchester Lace would acquire the Debtor's customers. As testified to by Gaetano in response to the Court's questioning of him regarding the reasons for such sales, "For -- if we were going to be working at Westchester, it was important for us to keep a relationship with the customers. If we were going to stay in the business, whether it was with Westchester or anybody else, we were trying to keep a relationship with the customers." (Tr3 at p. 96, line 2 -p. 98, line 24.)

59.     There was no attempt by any of the principals of the Debtor, including Edelson, who was also a principal of Westchester Lace, to ensure that the value of the Debtor's assets, including its inventory, were being maximized for the Debtor's estate. (Tr3 at p. 95, line 5 -p. 97, line 23.)

60.     Westchester Lace continued selling the Debtor's inventory through the year 2004, as evidenced by a Westchester Lace document reflecting "Total Original Silverman Inventory Invoiced by Westchester." (Exhibit D16, Tr. at p. 201, line 11 -p. 202, line 5; Tr3 at p. 168, line 17 -p. 170, line 15.)

61.     Although it began selling the Debtor's inventory on May 16, 1997, Westchester Lace did not acquire purported title to the Debtor's inventory until 1998, when HUB and Westchester Lace (by its President Edelson) executed a bill of sale ("Bill of Sale") for Westchester Lace's after-the-fact purchase of the inventory, among other assets of the Debtor, from HUB. (Exhibit D14; Tr3 at p. 165, line 24 -p. 168, line 11.)

62.     By the time HUB and Westchester Lace executed the Bill of Sale, Edelson already had caused Westchester Lace to sell off the bulk of the Debtor's inventory. (Tr3 at p. 168, line 17 -p. 170, line 6; Exhibit D14; Exhibit D16.)

63.     No notice was ever prepared, sent, served, advertised, posted or filed by Westchester Lace, Edelson, HUB or the Debtor of any intention on their respective part(s) to auction or otherwise sell any of the Debtor's inventory, whether under Article 9 of the New Jersey Uniform Commercial Code or under the New Jersey Bulk Transfer Act. (N.J.S.A. § 17:128-204 (1997); N.J.S.A. § 12A:9-507 (1997).)

64.     Neither Edelson, Westchester Lace, HUB nor the Debtor solicited any offers by any third parties to purchase all or any portion of the Debtor's inventory.

65.     The Bill of Sale recited that Westchester Lace paid $602,071.64 for certain assets of the Debtor, including the inventory, most of which Edelson already had caused Westchester Lace to sell, together with office furniture, business machines and warehouse equipment. (Exhibit D14; Tr3 at p. 199, lines 12-16.)

66.     HUB did not negotiate the $602,071.64 purchase price for the Debtor's assets with Edelson and Westchester Lace as an arm's length bargained-for transaction; HUB simply quoted the $602,071.64 purchase price as the amount it required to "consummate" the sale. Indeed, "Schedule A (Extended)" to the Bill of Sale itself attributed the following respective dollar amounts to the Debtor's inventory which was among the Debtor's assets sold thereunder: $394,662 for 67,854 pounds of greige goods, and $399,568 for 579,519 yards of finished goods, which numbers aggregate $794,230. (Tr3 at p. 200, line 23 -p. 201, line 9; p. 229, lines 10-23; Exhibit D14.)

67.     This aggregate amount of $794,230 is within $2,000 of the cost that the Debtor incurred for the inventory, $ 796,000, as set forth in a letter, dated May 23, 1997, from Robert M. Eisenberg, Senior Vice President of the Daley-Hodkin Appraisal Corporation to John Cina of HUB. (Exhibit P45, Exhibit C, at p. 3.)

68.     Thus, the $602,071.64 amount listed in the Bill of Sale represented, not the value of the Debtor's inventory and other assets sold, but, rathe,r the amount required to pay off the Loan, and other loan indebtedness of the Debtor to HUB, as of June 12, 1997 - $304,825 for the Loan; $232,852.15 for loan number 7552509112; and $63,562.85 for loan number 10875; plus per diem interest. (Tr3 at p. 229, line 10 -p. 232, line 16; Exhibit P45.)

69.     After HUB and Westchester Lace executed the Bill of Sale in the amount of $602,071.64, Edelson, Gaetano and Bloom were relieved of any outstanding liability on the

personal loan guaranties that they had given to HUB for the Loan. (Tr3 at p. 232, line 17 -

p. 233, line 10.) Thus, by causing Westchester Lace to sell, without any authority, the Debtor's

inventory beginning on May 16, 1997, Edelson improperly enabled himself to be relieved of his

personal guaranties.


> **H.** **Edelson, While Principal of Both Companies, Effectuated Westchester Lace's Cost-Free Acquisition of the Debtor's Core Assets, Causing Westchester Lace to Experience a Substantial Increase in its Overall Sales Attributable to its Sales of the Debtor's Goods and its Use of the Debtor's Customer List**

70.     Westchester Lace's cost-free appropriation of the Debtor's core assets

resulted in a very substantial increase in Westchester Lace's sales in 1997. For that year, its net

sales were approximately $25,875,000, an increase over its 1996 sale figure of $22,490,049

which, in turn, had been a twelve and a half percent decrease from its 1995 sale figure. (Exhibit

P21B; Exhibit P21A.)

71.     This was in contrast to the significant decline in sales which lace and other

textile manufacturers were experiencing over this period of time - and which Westchester Lace

itself had been experiencing through 1996. (Tr2 at p. 70, line 6 -p. 75, line 11.)

72.     Westchester Lace's bucking of the industry-wide trend was attributable to

its taking over the Debtor's Customer List and the Debtor's goods without paying anything for

same.

73.     Westchester Lace sold the Debtor's goods, as well as its own inventory, to

customers of the Debtor through Westchester Lace's appropriation and use of the Debtor's

Customer List, as well as of the Debtor's library of lace styles.

74. Such sales by Westchester Lace continued through at least 2007. (Exhibit P15, Exhibit P15, Exhibit P17, Exhibit P18; Exhibit P41.)

75. In a letter from Romano to Edelson at Westchester Lace dated October 8, 1997 (the "Romano Letter"), Romano, in reviewing Westchester Lace's operations for the eight (8) month period ending August 31, 1997, characterized the sales discussed in ¶¶ 29-34, supra, as "post-merger sales of Silverman Lace (MSL)." (Exhibit P14; Exhibit P2, Edelson Depo 2, at p. 224, line 14 -p. 226, line 14.) (Emphasis added.)

76. Edelson did not discuss with Romano the latter's use of the term "post-merger," or advise him that the use of such term was incorrect. (Tr3 at p. 146, line 6 -p. 149, line 2.)

77. The Romano Letter also noted that "[p]er Diana [referring to Diana Steiner, Westchester Lace's in-house Controller], it is difficult to separate out Silverman's sales since many customers are both WL and MSL customers and are billed by WL." (Tr2 at p. 53, lines 4-17; Exhibit P14.)

78. In practical terms, the Debtor's core assets had been "merged" into Westchester Lace's business operations.

79. However, this "merger" was effectuated without any documented agreement between the Debtor and Westchester Lace. (Tr2 at p. 53, lines 18-24; Tr3 at p. 104, lines 3-7.)

80. The "merger" was also effectuated without Westchester Lace or Edelson paying anything to the Debtor for the Debtor's assets "acquired" by Westchester Lace.

81. Westchester Lace and the Debtor never entered any written agreements providing for the "pooling" of customer lists. (Tr3 at p. 133, line 8 -p. 135, line 10.)

82.     Neither Edelson nor Westchester Lace ever paid consideration to the Debtor or to any of the Debtor's bankruptcy trustees for the "pooling" of customer lists. (Tr3 at p. 39, line 20 -p. 40, line 9; Tr3 at p. 134, lines 11 -13; Exhibit P1, Edelson Depo 1, at p. 146, lines 14 -17.)

83.     Neither Edelson nor Westchester Lace ever entered any written agreements providing for the purchase of any of the Debtor's assets by Westchester Lace (Tr3 at p. 83, lines 1-4; Exhibit P2, Edelson Depo 2, at p. 215, line 2 -p. 216, line 18.)

84.     Neither Edelson nor Westchester Lace ever paid consideration to the Debtor or to any of the Debtor's bankruptcy trustees for any of the Debtor's assets including, without limitation, the Debtor's inventory, the Debtor's customer lists, or the Debtor's employees, which Edelson caused Westchester Lace to appropriate for the Remaining Defendants' benefit. (Tr3 at p. 134, lines 14 -18; Tr2 at p. 80, line 6 -p. 85, line 12.)

85.     Rather, exerting his control as a principal of both companies, Edelson caused Westchester Lace to take over effective ownership of the Debtor's assets before the Petition Date without paying a penny to the Debtor for those assets.

86.     All of this took place at a time when, as set forth below, the Debtor was insolvent.

## IV.    THE DEBTOR WAS INSOLVENT AS OF DECEMBER 31, 1996

87.     Under the three commonly-used methods of determining insolvency, the Debtor was insolvent no later than as of December 31, 1996. (Plotzker Aff., ¶¶ 15-25; Exhibit P22.)

88.     The Remaining Defendants did not dispute the foregoing at trial.

## A. **Balance Sheet Insolvency**

89.     Based on the Balance Sheet approach to determining insolvency, the Debtor's liabilities exceeded the fair value of the its assets, and the Debtor was therefore insolvent, no later than as of December 31, 1996. (Plotzker Aff., ¶¶ 16-19; Exhibit P22.)

90.     All of the data reflected in the Statement of Assets and Liabilities and Stockholder's Deficit of the Debtor for the year ended December 31, 1996 (the "Balance Sheet") are based on book value of the Debtor. (Plotzker Aff., ¶ 17; Joint Exhibit XVIII; Exhibit P22.)

91.     The Successor Trustee's Accountant, Andrew W. Plotzker, CPA ("Plotzker"), testified that although the fair value of the Debtor's assets were lower than those reflected in the Balance Sheet due to the inability of the Debtor to generate a profit from its lace business operations, and to negative economic trends affecting the lace industry and market within which the Debtor operated, he did not incorporate any adjusting entry to arrive at fair value, and even without such a downward adjustment of asset value, the Debtor's liabilities still exceeded its assets.[8] (Plotzker Aff., ¶ 17; Exhibit P1, Edelson Depo 1, at p. 122, line 24 -p. 123, line 13.)

92.     Although individual assets appearing in the Balance Sheet and intangible assets (not reflected therein), such as customer lists, library of lace styles, key employees and good will, existed and could have been sold, no combination of actions would have sufficiently reduced the net worth deficiency and therefore overcome the Debtor's insolvency as of December 31, 1996. (Plotzker Aff., ¶ 18.)

---

[8]     As set forth in Plotzker's trial testimony, even attributing $550,000 in value for the Debtor's intangible assets, the Debtor was still insolvent as of December 31, 1996 and continually thereafter through the Petition Date. (Plotzker Aff., ¶ 17, n.3.)

93. In short, under the Balance Sheet Approach, the Debtor was insolvent as of December 31, 1996. (Plotzker Aff., ¶ 19.)

## B. Capitalization Approach to Insolvency

94. Based on the Capitalization approach to determining insolvency, the Debtor had insufficient working capital and was, therefore, insolvent no later than as of December 31, 1996. (Plotzker Aff., ¶¶ 20-24; Exhibit P22.)

95. Analysis under this approach requires calculation of working capital and solvency ratios of the Debtor as of December 31, 1996, based upon the pertinent figures contained in the Balance Sheet in order to verify that the Debtor did not have adequate working capital to meet its business requirements. (Plotzker Aff., ¶ 20; Exhibit P22.)

96. An analysis of the Debtor's working capital components confirms that the Debtor had insufficient working capital as of December 31, 1996. Having an insufficiency of working capital proves that the Debtor did not have the ability to pay its debts as they became due:

| | |
|---|---|
| Current Assets at fair value | $1,874,641 |
| Less: Current Liabilities | $3,138,650 |
| Working Capital Deficiency | ($1,264,009) |

(Plotzker Aff., ¶ 20; Exhibit P22, at pages 7-8.)

97. Based on the above analysis, the Debtor had a working capital deficiency of $1,264,009 as of December 31, 1996 and was, thus, insolvent as of that date. (Plotzker Aff., ¶ 21; Exhibit P22.)

98. An entity not exhibiting financial difficulty should have positive working capital, i.e., a working capital amount significantly in excess of zero would be necessary in order for an entity to be deemed financially healthy. Thus, the Debtor's actual working capital shortfall was substantially higher than the number appearing above. (Plotzker Aff., ¶ 21; Exhibit P22.)

99. Because, as set forth above under the Balance Sheet approach to determining insolvency, the fair value of the current assets of the Debtor was less than the current assets of $1,874,641, the deficiency was even greater and, therefore, under this Capitalization Approach, insolvency occurred much before December 31, 1996. (Plotzker Aff., ¶ 21; Exhibit P22.)

100. Solvency ratios are accepted by the accounting profession as standard measurements and indicia of an entity's financial health. The quick ratio (current assets less inventory divided by current liabilities) and the current ratio (current assets/current liabilities) reflect the short-term solvency of a company. A company is deemed inadequately capitalized if its quick ratio is below 0.5 and its current ratio is less than 1. The current liabilities to net worth ratio and total liabilities to net worth ratio reflect how the company's current and total debt relates to the shareholders' equity. The higher these ratios are, the less protection there is to creditors and the higher the chances of insolvency. A current liabilities to net worth ratio of below 0.80 but greater than zero is generally considered appropriate for a business. The solvency ratios of the Debtor as of December 31, 1996 were as follows:

| | |
|---|---|
| Quick Assets | 0.22 |
| Current Ratio | 0.60 |
| Current Liability to Net Worth Ratio | -2.37 |
| Total Liabilities to Net Worth Ratio | -2.50 |

(Plotzker Aff., ¶ 22; Exhibit P22.)

101.     Both the quick and current ratios of the debtor were below acceptable levels as of December 31, 1996, and as the Debtor had negative shareholders' equity, this resulted in other ratios being negative. (Plotzker Aff., ¶ 23; Exhibit P22.)

102.     Based on the foregoing, the Debtor was undercapitalized and thus insolvent no later than December 31, 1996. (Plotzker Aff., ¶ 24; Exhibit P22.)

### C.     Cash Flow Approach to Insolvency

103.     Based on the Cash Flow approach to determining insolvency, the Debtor could not pay its invoices and other outstanding obligations as they came due, had insufficient working capital and was, therefore, insolvent no later than December 31, 1996. (Plotzker Aff., ¶ 25; Exhibit P22; Joint Exhibit XVIII; Exhibit P39, at page 38.)

104.     Commencing in December 1995 and continuing through the year 1996, a $300,000 loan from Hudson United Bank to the Debtor, which had originally been made in September 1995 and was supposed to be a short-term ninety (90) day loan, had to be renewed several times by reason of the conceded fact that the Debtor did not have sufficient funds to pay off the loan (Plotzker Aff., ¶ 25; Exhibit P22; Joint Exhibit IX, Joint Exhibit XI, Joint Exhibit XIII, Joint Exhibit XIX; Exhibit P4 at p. 126, line 10 -p. 130, line 19; and Exhibit P8B, Exhibit P8C, Exhibit P8D.)

105.     That remained true as of January 1, 1997, when the loan had to be renewed yet again for a period of five months. (Plotzker Aff., ¶ 25; Exhibit P22; Joint Exhibit XIV.)

106.     In addition, as evidence of the Debtor's inability to pay creditors as its debts became due, the Debtor's Accounts Payable Forecast Report as of December 12, 1996

reveals that approximately seventy-five percent (75%) of amounts owing to vendors were past due and unpaid as of December 12, 1996. (Plotzker Aff., ¶ 25; Exhibit P22; Exhibit P39, at page 38, which contains bates number S 001465.)

107. In addition to the foregoing, the Debtor, as already set forth in the discussion of the Capitalization Approach above, had negative working capital as of December 31, 1996. (Plotzker Aff., ¶ 25; Exhibit P22.)

108. As a result, the Debtor did not have adequate cash flow and was, thus, insolvent no later than as of December 31, 1996 under the Cash Flow Approach as well. (Plotzker Aff., ¶ 25; Exhibit P22.)

### D.    The Debtor was Insolvent

109. Accordingly, the Debtor was insolvent no later than as of December 31, 1996, and in fact well before then and its insolvency continued through the Petition Date, May 14, 1997. (Plotzker Aff., ¶¶ 15-25; Exhibit P22.)

## V.    OUTSTANDING ACCOUNTS RECEIVABLE OWED BY WESTCHESTER LACE TO THE DEBTOR'S ESTATE FOR UNPAID DEBTOR GOODS SOLD AND DELIVERED TO WESTCHESTER LACE

110. As of the Petition Date, the Debtor had outstanding receivables due from Westchester Lace for goods sold and delivered by the Debtor to Westchester Lace between February 12, 1996 through May 2, 1997 in an aggregate amount of $133,886 (the "Outstanding Accounts Receivable"). (Tr3 at p. 176, line 15 -p. 179, line 12; Exhibit P23.) (See also Exhibit P1, Edelson Depo 1, at page 70, lines 4-21.)

111.    Westchester Lace never paid the Debtor or any of the Debtor's bankruptcy trustees any portion of the Outstanding Accounts Receivable. (Tr3 at p. 178, line 8 -p. 179, line 13.)

## VI.    SALE OF GOODS TO WESTCHESTER LACE AT A DISCOUNT

112.    At a time when Edelson was both a principal of Westchester Lace and the Debtor and, thus, had considerable influence over the affairs of the Debtor, the Debtor sold Westchester Lace goods at a discount that was not given to other of the Debtor's customers.

113.    During the period February 12, 1996 through May 2, 1997, the total sales by the Debtor to Westchester Lace were $135,040. (Tr. at p. 191, line 21 -p. 193, line 13; Plotzker Aff., ¶ 48; Exhibit P23.)

114.    A random sample of invoices from the Debtor to Westchester Laces and other of the Debtor's customers during the year 1997 reveals that where the Debtor sold goods identified by the same style number to both Westchester Lace and another customer, in almost every instance, the sale to Westchester Lace was at a discount that can be conservatively estimated to average between ten to twenty-five percent (10-25%) compared to the Debtor's sale price of that same style to other customers. (Tr. at p. 193, line 14 -p. 197, line 10; Plotzker Aff., ¶ 48; Exhibit P24.)

115.    For example, on April 8, 1997, the Debtor sold two units of pattern number 00150HH in black to Westchester Lace for $3.35 per unit, which was approximately a twenty-five percent (25%) discount off the $4.50 per unit price that the Debtor charged D. J. Summers for the same pattern number four days earlier on April 4, 1997. (Tr. at p. 194, line 2 - p. 195, line 12; Exhibit P24.)

116.    On May 2, 1997, the Debtor sold one unit of pattern number 00100HH in white to Westchester Lace for $2.30 per unit, which was approximately a thirteen percent (13%) discount off the $2.65 per unit price that the Debtor charged Jordan Taylor, Inc. for two units of the same pattern number four days earlier. (Tr. at p. 195, line 13 -p. 196, line 1; Exhibit P24.)

117.    On April 16, 1997, the Debtor sold one unit of pattern number 11474 in white to Westchester Lace for $3.35 per unit, which was approximately a twenty-nine percent (29%) discount off the $4.75 per unit price that the Debtor charged City Sites Sportswear for the same pattern number just two weeks earlier April 1, 1997. (Tr. at p. 196, line 2 -p. 197, line 9; Exhibit P24.)

118.    In general, there was a discount of ten to twenty-five percent (10-25%) on the total sales amount of $135,040 of Debtor goods sold to Westchester Lace during this period. Therefore, the total discount for Debtor goods sold to Westchester Lace ranged from approximately $15,000 to $22,000. (Plotzker Aff., ¶ 48; Exhibit P24.)


## VII.    DAMAGES

### A.    Value of the Debtor's Misappropriated Goods and Intangible Assets

119.    Damages caused to the Debtor's estate by the misappropriation of the Debtor's inventory and intangible assets by Edelson and Westchester Lace, are measured by (1) calculating the estimated sales that Westchester Lace gained from such acts; (2) applying the Debtor's 1996 gross-profit ratio to the estimated sales to determine the estimated gross profit to Westchester Lace; (3) deducting the estimated expenses that Westchester Lace incurred related

to such sales; and (4) applying a purchase price multiplier to value the Debtor's assets misappropriated by Westchester Lace.

120.    Edelson caused Westchester Lace to appropriate various of the Debtor's assets, including the Debtor's inventory, Customer List, unfilled orders, and its good will, without giving any monetary consideration or other consideration to the Debtor.

### 1.    <u>Estimated Sales Gained by Westchester Lace</u>

121.    As reflected in a document produced by Westchester Lace entitled "Monthly Sales Totals for 1996-2000 for Customer List Provided," the total dollar amount of sales by Westchester Lace of Westchester Lace styles to former customers of the Debtor for the year 1997 was $2,430,029 (the "Westchester Lace Appropriated Direct Sales"), as calculated and summarized in Exhibit P27.[9]  (Exhibit P25; Exhibit P27.)

122.    As reflected in documents produced by Westchester Lace entitled (i) "Monthly style sales totals for 1996-2000 for customer list provided," (ii) "Monthly style sales totals for 1996-2000 for customer list provided," (iii) "Monthly style sales totals for 1996-2000 for customer list provided" and (iv) an untitled document, the total dollar amount of sales by Westchester Lace of Debtor goods to former customers of the Debtor for the period May 1997 through December 1997 (the period of Westchester Lace's appropriation of the Debtor's assets for that portion of 1997) was $2,124,732 (the "Sales of Appropriated Debtor Goods").[10]  (Tr. at

---

[9]    Goods identified by the prefix "S" in Exhibit P15, Exhibit P16, Exhibit P17, Exhibit 18 and Exhibit P25 are Debtor goods.  (Exhibit P1, Edelson Depo 1, at p. 11, line 8 -p. 14, line 22.)

[10]    Daniel Ventricelli, CPA, who was a Director of Kahn Consulting, Inc., the Special Accountant to the Original Trustee, and the Prior Successor Trustee, and who conducted an investigation of the pre-petition conduct of the Debtor and its principals, was not given access to Westchester Lace documents regarding exclusive Westchester Lace customers or sales before May 14, 1997.  Had such documentation been accessible, it may have

p. 153, line 10 -p. 154, line 16; Exhibit P15; Exhibit P16; Exhibit P17; Exhibit P18; Exhibit P27.)

123.    Were the Sales of Appropriated Debtor Goods to be annualized, the aggregate of that annualized amount and of the Westchester Lace Appropriated Direct Sales would be approximately $5,800,000 (the "Annualized Aggregate Appropriated Sales").

124.    The amount of the Annualized Aggregate Appropriated Sales includes any effect attributable to the pooling of customers between Westchester Lace and the Debtor. (Tr. at p. 156, line 9 -p. 157, line 25.)

125.    A discount of the Annualized Aggregate Appropriated Sales to $5,000,000 (the "Estimated Sales") in order to calculate the damages caused to the Debtor's estate is extremely conservative in light of the respective historical sales figures of the Debtor and Westchester Lace, the use of which would result in a higher dollar amount for the Estimated Sales:

a)      During the approximate four and a half month period from January 1, 1997 until the Petition Date of May 14, 1997, the Debtor had aggregate net sales of approximately $3,100,000, exclusive of sales to by Westchester Lace to customers of the Debtor.

b)      During the approximate four and a half month period from January 1, 1997 until the Petition Date of May 14, 1997, Westchester Lace had reported aggregate net sales of approximately $1,600,000.

c)      Annualizing these amounts would result in a sales number in excess of $12,000,000.

(Plotzker Aff., ¶ 44; Exhibit P37, at page 2; Exhibit P38, at page 3; Exhibit P13.)

revealed that Westchester Lace's sales of the Debtor's goods was even higher than the $2,124,732 amount of sales to former customers of the Debtor. (Tr. at p. 108, line 19 -p. 110, line 14; Direct Testimony of Daniel Ventricelli, sworn to on February 21, 2008, ¶¶ 1, 5.)

126. The $5,000,000 Estimated Sales figure is also conservative when one examines the sales figures comparable to the Westchester Lace Appropriated Direct Sales and the Sales of Appropriated Debtor Goods for the year 1998, which aggregated $5,225,310, based upon the exhibits used to calculate the Westchester Lace Appropriated Direct Sales and the Sales of Appropriated Debtor Goods. (Plotzker Aff., ¶ 44; Exhibit P15; Exhibit P16; Exhibit P17; Exhibit P18; Exhibit P25; Exhibit P27.)

127. Further, the $5,000,000 Estimated Sales figure is conservative because it excludes approximately $1,321,900 of Westchester Lace's sales of the Debtor's business of converted goods to Westchester Lace's pre-existing customers during the period May 1997 through December 1997, which sales are revealed by a comparison of Westchester Lace's sales of approximately $3,446,715 of converted goods, as reflected on page five of Westchester Lace's General Ledger Trial Balance for the year 1997, with the $2,124,732 of Sales of Appropriated Debtor Goods. (Plotzker Aff., ¶ 44, n.7; Exhibit P27; Exhibit P38.)

## 2. Determination of Estimated Gross Profit

128. The estimated gross profit that Westchester Lace gained as a result of its misappropriation of the Debtor's inventory and intangible assets is determined by applying the Debtor's gross profit ratio to the Estimated Sales.

129. Based on the Debtor's 1996 Financial Statements, which lists a reported gross profit of $1,634,000 and reported net sales of $9,653,000, the Debtor's actual gross profit for 1996 was seventeen percent (17%) -- calculated by dividing the reported gross profit by the reported net sales. (Tr. at p. 158, line 18 -p. 160, line 7; Plotzker Aff., ¶ 44; Exhibit P27; Exhibit P26.)

28

130.     Applying the Debtor's seventeen percent (17%) actual gross profit ratio to the Estimated Sales figure of $5,000,000, Westchester Lace gained an estimated gross profit of $850,000 as a result of the acts of misappropriation by the Remaining Defendants (the "Estimated Gross Profit").  (Plotzker Aff., ¶ 45.)

131.     The use of the Debtor's seventeen percent (17%) actual gross profit ratio to calculate the Estimated Gross Profit is conservative because in 1996 the Debtor's true gross profit was actually twenty four percent (24%); the reported gross profit was seventeen percent (17%) due to the completion of a process of liquidating excess inventory, a process  that began in 1995.  (Plotzker Aff., ¶ 45, n.8.)

132.     The Estimated Gross Profit includes a deduction for post-petition overhead.  (Tr. at p. 166, lines 7-16.)

### 3.     Deduction of Estimated Expenses Incurred by Westchester Lace Related to Misappropriation

133.     A deduction of estimated expenses incurred by Westchester Lace related to its misappropriation of the Debtor's inventory and intangible assets results in the Earnings Before Interest, Depreciation and Tax ("EBIDT") that Westchester Lace derived from such misappropriation.

134.     Westchester Lace incurred an estimated $385,000 in selling and shipping expenses with respect to the Estimated Gross Profit based on a downward adjustment of the $892,473 of such expenses that the Debtor incurred for the year 1996.  (Plotzker Aff., ¶ 45; Exhibit P26 (Supplemental Information, at page 7).)

135.     Westchester Lace incurred an estimated $280,000 in general and administrative expenses with respect to the Estimated Gross Profit based on a downward

adjustment of the Debtor's such expenses of $2,087,182 for the year 1996. (Plotzker Aff., ¶ 45; Exhibit P26 (Supplemental Information, at page 7).)

136.    Deducting (i) $385,000 in selling and shipping expenses and (ii) $280,000 in general and administrative expenses from the Estimated Gross Profit results in EBIDT of $185,000 that Westchester Lace derived from such misappropriation. (Tr. at p. 168, line 24 - p. 176, line 20; Exhibit P13; Exhibit P14.)

### 4.    Application of Purchase Price Multiplier

137.    Because prospective purchasers typically value a business as a multiple of its cash flow upon the sale of the business, the Debtor's EBIDT of $185,000, which equates to its cash flow, must be adjusted by a multiple of similar businesses in the industry in order to determine the value of the Debtor's business that Westchester Lace appropriated. (Plotzker Aff., ¶ 45.)

138.    As set forth in a well-recognized publication by NVST, Inc., listing purchase price ratios for certain industries based on detailed studies of publicly reported sales of companies, purchase price multiples for publicly reported sales of companies in the textile mill products industry averaged 7.79 in 1996-97. (Plotzker Aff., ¶ 45; Exhibit P29.)

139.    In 1998-2000, these multiples averaged 4.02. (Plotzker Aff., ¶ 45; Exhibit P29.)

140.    Discounting those multiples based on, among other things, the size of the Debtor, the EBIDT should be multiplied by a factor of three (3) in order to determine the value of the business that Westchester Lace appropriated. (Plotzker Aff., ¶ 45.)

141.    Upon this adjustment, the value of the Debtor's assets appropriated by the Remaining Defendants, without paying the Debtor any consideration therefor, totals $550,000. (Plotzker Aff., ¶ 45.)

## B.    Alternate Calculation of Value of the Debtor's Misappropriated Assets[11]

142.    By commencing to sell the Debtor's inventory on May 16, 1997, and continuing to do so thereafter without the consent of the Debtor, the Bankruptcy Court, or any of the Debtor's original bankruptcy trustees, Westchester Lace, at Edelson's direction, prevented a commercially reasonable sale of the Debtor's inventory from being conducted by HUB pursuant to its security interest therein, in contravention of the New Jersey Bulk Transfer Act, N.J.S.A. 17:128-204 (1997), and the New Jersey Uniform Commercial Code, N.J.S.A. § 12A:9-507 (1997).

143.    The damage incurred by the Debtor as a result of the foregoing is the amount of $234,230, which represents the difference between (i) the aggregate value of $794,230 that is attributed to the Debtor's inventory in Schedule A (Extended) of the Bill of Sale, (Exhibit D14), and (ii) $560,000, the amount, after the transfer by the Debtor's factor, BNY Financial Corporation ("BNY"), to HUB of a credit balance due from BNY to the Debtor.  (Tr. at p. 99, line 5 -p. 100, line 1.)

---

[11]    The Successor Trustee submits the calculation set forth in subsection B as an alternative to the calculation of damages set forth in subsection A.

**C.** **Outstanding Accounts Receivable Owed by Westchester Lace to the Debtor's Estate for Unpaid Debtor Goods Sold and Delivered to Westchester Lace**

144. As of the Petition Date, the Outstanding Accounts Receivable totaled $133,886. (See, ¶¶ 110-11, supra; Tr3 at p. 176, line 15 -p. 179, line 12; Exhibit P23.)

145. Westchester Lace never paid the Debtor or any of the Debtor's bankruptcy trustees any portion of the Outstanding Accounts Receivable, and this still owes the Debtor the amount of $133,866, plus interest thereon as calculated under paragraphs 195-204, infra. (Exhibit P23.)

**D.** **Sale of Goods to Westchester Lace at a Discount**

146. During the period February 12, 1996 through May 2, 1997, Westchester Lace purchased style goods from the Debtor in the amount of $135,040, which amount represented a discount that can be conservatively estimated to average between ten to twenty-five percent (10-25%) compared to the Debtor's sale price of those same styles to other customers. (See, ¶¶ 112-18, supra; Tr. at p. 191, line 21 -p. 193, line 13; Plotzker Aff., ¶ 48; Exhibit P23.)

147. Based on the total sales amount of $135,040 to Westchester Lace during this period, the aggregate discount of ten to twenty-five percent (10-25%) given to Westchester Lace was an amount that ranged between $15,000 and $22,000, which averages out to $18,500. (Plotzker Aff., ¶ 48; Exhibit P24.)

# PROPOSED CONCLUSIONS OF LAW

## VIII.  WESTCHESTER LACE MISAPPROPRIATED AND CONVERTED THE DEBTOR ASSETS FOR ITS OWN BENEFIT

148.  Westchester Lace appropriated to itself various of the Debtor's assets, including, without limitation, the Debtor's inventory, unfilled orders, Customer List, employees, and good will (collectively, the "Debtor Assets"), without giving adequate monetary or other consideration to the Debtor for those assets.

149.  The foregoing constituted a misappropriation and conversion of the Debtor Assets.  Pereira v. Binet (*In re* Harvard Knitwear, Inc.), 153 B.R. 617, 624-625 (Bankr. E.D.N.Y. 1993).  As a result of such misappropriation and conversion, Westchester Lace is liable to the Debtor for the value of the Debtor Assets misappropriated in the amount of $550,000 (the "Misappropriation").

150.  The Successor Trustee is entitled to pre-judgment interest on the $550,000 value of the Debtor Assets misappropriated by Westchester Lace.  (See, ¶¶ 195-204, infra.)

151.  Accordingly, Westchester Lace is liable to the Successor Trustee for its misappropriation and conversion of the Debtor Assets in the amount of $550,000, together with prejudgment interest thereon, as calculated in the manner set forth in paragraphs 195-97, infra.

**IX. ALTERNATIVELY, THE MISAPPROPRIATION TRANSFERS SHOULD BE AVOIDED AS INTENTIONALLY FRAUDULENT TRANSFERS, PURSUANT TO 11 U.S.C. § 544 AND SECTION 25:2-25A OF THE NEW JERSEY UNIFORM FRAUDULENT TRANSFER ACT, AND THE SUCCESSOR TRUSTEE IS ENTITLED TO RECOVER FROM WESTCHESTER LACE THE VALUE OF THE DEBTOR ASSETS FRAUDULENTLY TRANSFERRED**

152.    Under Section § 544(b)(1) of the United States Bankruptcy Code (the "Bankruptcy Code") and Section 25:2-25a of the New Jersey Uniform Fraudulent Transfer Act ("NJUFTA," codified at New Jersey Statutes Annotated ("N.J.S.A.") § 25:2-20 et seq.),[12] the transfers to Westchester Lace of the misappropriated Debtor Assets (the "Misappropriation Transfers") can be avoided by the Successor Trustee if they were made with "actual intent to hinder, delay, or defraud any creditor of the debtor."

153.    Courts interpreting the NJUFTA have held that where certain "badges of fraud" are present, an actual intent to hinder, delay or defraud any creditor of the debtor under Section 25:2-25a of the NJUFTA may be inferred. Gilchinsky v. National Westminster Bank N.J., 159 N.J. 463, 476, 732 A.2d 482, 489 (1999). As enumerated in Section 25:2-26 of the NJUFTA, the "badges of fraud" to which "consideration may be given, among other factors," include whether:

   a.    The transfer or obligation was to an insider;

            . . .

   c.    The transfer or obligation was disclosed or concealed;

            . . .

   e.    The transfer was of substantially all the debtor's assets;

---

[12]    As both Westchester Lace and the Debtor were incorporated under the laws of the State of New Jersey, and at all times relevant to the claims in this Adversary Proceeding, their principal offices were located in New Jersey, the applicable state law here under the avoidance provision of Section 544 (b)(1) of the Bankruptcy Code is that of New Jersey.

. . .

g.     The debtor removed concealed assets;

h.     The value of the consideration received by the debtor was reasonably equivalent to the value of the obligation incurred; [and]

i.     The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; . . . .

N.J.S.A. § 25:2-26.

154.    "In determining actual intent to defraud, courts should balance the factors enumerated in N.J.S.A. 25:2-26, as well as any other relevant factors to the transaction." Gilchinsky, 159 N.J. at 477, 732 A.2d at 489. "The proper inquiry is whether the badges of fraud are present, . . . [and although the presence of one] may cast suspicion on the transferor's intent, the confluence of several [badges of fraud] in one transaction generally provides conclusive evidence of an actual intent to defraud." Gilchinsky, 159 N.J. at 477, 732 A.2d at 489-90.

155.    The Misappropriation Transfers (i) were made by the Debtor, of which at all relevant times Edelson was an insider, to Westchester Lace, of which at all relevant times Edelson was the sole shareholder and President, (ii) were not disclosed to the Bankruptcy Court, the Original Trustee or HUB, (iii) were comprised of substantially all of the Debtor's assets, (iv) were not in exchange for consideration that was reasonably equivalent in value to that of the Debtor Assets, and (v) occurred while the Debtor was insolvent. Therefore, an intent to defraud can be presumed.

156.    For the foregoing reasons, the Successor Trustee is entitled to the avoidance of the Misappropriation Transfers under Section 544(b)(1) of the Bankruptcy Code.

157.    Accordingly, pursuant to Section U.S.C. § 550(a)(1), the Successor Trustee may recover from Westchester Lace the value of the avoided Misappropriation Transfers.

158.    Accordingly, the Successor Trustee is entitled to recovery against Westchester Lace in the amount of $550,000, representing the value of the Debtor Assets fraudulently transferred, together with prejudgment interest thereon, as calculated in the manner set forth in paragraphs 195-204, infra.


X.    **ALTERNATIVELY, THE MISAPPROPRIATION TRANSFERS SHOULD BE AVOIDED AS CONSTRUCTIVELY FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 544 AND SECTION 25:2-25B OF THE NEW JERSEY FRAUDULENT TRANSFER ACT, AND THE SUCCESSOR TRUSTEE IS ENTITLED TO RECOVER FROM WESTCHESTER LACE THE VALUE OF THE DEBTOR ASSETS FRAUDULENTLY TRANSFERRED**

159.    Pursuant to Section 544(b)(1) of the Bankruptcy Code, the Successor Trustee may avoid the Misappropriation Transfers by showing that they could have been avoided by an unsecured creditor under the NJUFTA.  Under Section 25:2-25b of the NJUFTA, the transfers are avoidable if they were made:

> Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> (1)    Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (2)    Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

N.J.S.A. § 25:2-25b.

160.    The evidence at trial demonstrates that the Misappropriation Transfers were not in exchange for a reasonably equivalent value and were made at a time when the Debtor

36

was insolvent, thereby satisfying the above-cited requirements of both subsections (1) and (2) of Section 25:225b of the NJUFTA.

161.    At least one creditor of the Debtor was in existence as of the time of the Misappropriation Transfers and, thus, could have avoided the Misappropriation Transfers under the NJUFTA, that being Connecticut General Life Insurance Company ("Connecticut General"). The Court takes judicial notice of the Claims Register and the documentation on file in support thereof in the Debtor's bankruptcy case, which indicates that the Debtor was indebted to the creditor Connecticut General since February 1995. (See Proof of Claim #47.)

162.    For the foregoing reasons, the Successor Trustee is entitled to the avoidance of the Misappropriation Transfers under Section 544(b)(1) of the Bankruptcy Code.

163.    Accordingly, pursuant to Section U.S.C. § 550(a)(1), the Successor Trustee may recover from Westchester Lace the value of the avoided Misappropriation Transfers.

164.    Accordingly, the Successor Trustee is entitled to recovery against Westchester Lace in the amount of $550,000, representing the value of the Debtor Assets fraudulently transferred, together with interest thereon calculated in the manner set forth in paragraphs 195-204, infra.

XI.    **ALTERNATIVELY, THE SUCCESSOR TRUSTEE IS ENTITLED TO RECOVER DAMAGES AGAINST WESTCHESTER LACE FOR INTENTIONALLY PREVENTING THE CONDUCTING OF A COMMERCIALLY REASONABLE SALE OF THE DEBTOR'S INVENTORY BY HUDSON UNITED BANK**

165.    As set forth above in paragraph 142, supra, by intentionally and knowingly commencing to sell the Debtor's inventory on May 16, 1997, and continuing to do so

37

thereafter, without the consent of the Debtor, the Bankruptcy Court, or any of the Debtor's bankruptcy trustees, Westchester Lace, at Edelson's direction, prevented a commercially reasonable sale of the Debtor's inventory from being conducted by HUB pursuant to the latter's security interest therein, in contravention of the New Jersey Bulk Transfer Act, N.J.S.A. 17:128-204 (1997), and the New Jersey Uniform Commercial Code, N.J.S.A. 12A:9-507 (1997).

166.    Westchester Lace thereby precluded the realization of any surplus from the sale of the inventory above the aggregate amount owed to HUB under its loans to the Debtor (the "HUB Loan Indebtedness"), to which surplus the Debtor would have been entitled. N.J.S.A. 12A:9-504(2) (1997).

167.    As set forth in paragraph 143, supra, the damages incurred by the Debtor as a result of the foregoing intentional malfeasance (the "Inventory Sale Malfeasance") on Westchester Lace's part was in the amount of $234,230, which represents the difference between (i) the aggregate value of $794,230 attributed to the Debtor's inventory in Schedule A (Extended) of the Bill of Sale, (Exhibit D14), which could have been realized had there been a commercially reasonable sale thereof, and (ii) $560,000, the amount (after the transfer by the Debtor's factor, BNY, to HUB, of a credit balance due from BNY to the Debtor) (Tr. at p. 99, line 3 -p. 100, line 1), that remained due and owing from the Debtor to HUB under the HUB Loan Indebtedness.

168.    Accordingly, the Successor Trustee is entitled to recovery against Westchester Lace in the amount of $234,230, together with interest thereon as calculated in the manner set forth in paragraphs 195-204, infra.

## XII. WESTCHESTER LACE IS LIABLE TO THE SUCCESSOR TRUSTEE FOR THE OUTSTANDING ACCOUNTS RECEIVABLE OF $133,886

169.    As set forth above, as of the Petition Date, the Debtor had outstanding accounts receivable due from Westchester Lace in an aggregate amount of $133,866.00 for goods sold and delivered by the Debtor to Westchester Lace between February 12, 1996 through May 2, 1997 (the "Open Receivables Transfers") for which Westchester Lace never paid any consideration to the Debtor or any of the Debtor's bankruptcy trustees. (See, ¶¶ 110-11, supra; Tr3 at p. 176, line 15 -p. 179, line 12; Exhibit P23.)

170.    Accordingly, Lace is liable for the Outstanding Accounts Receivable in the amount of $133,886, together with interest thereon as calculated in the manner set forth in paragraphs 195-204, infra.

171.    For the reasons set forth in paragraphs 178-83, infra, Westchester Lace is not entitled to a setoff against the Outstanding Accounts Receivable.

## XIII. ALTERNATIVELY, THE OPEN RECEIVABLES TRANSFERS SHOULD BE AVOIDED AS CONSTRUCTIVELY FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 544 AND SECTION 25:2-25B OF THE NEW JERSEY FRAUDULENT TRANSFER ACT, AND THE SUCCESSOR TRUSTEE IS ENTITLED TO RECOVER FROM WESTCHESTER LACE THE VALUE OF THE ASSETS FRAUDULENTLY TRANSFERRED

172.    As set forth above, as of the Petition Date, Westchester Lace never paid any consideration to the Debtor or any of the Debtor's bankruptcy trustees for the Outstanding Accounts Receivable. (See, ¶¶ 110-11, supra; Tr3 at p. 176, line 15 -p. 179, line 12; Exhibit P23.)

173.    Pursuant to Section 544(b)(1) of the Bankruptcy Code, the Successor

Trustee may avoid the Open Receivables Transfers by showing that they could have been

avoided by an unsecured creditor under the NJUFTA. Under Section 25:2-25b of the NJUFTA,

the transfers are avoidable if they were made:

> Without receiving a reasonably equivalent value in exchange for
> the transfer or obligation, and the debtor:
>
> (1)    Was engaged or was about to engage in a business or a
> transaction for which the remaining assets of the debtor
> were unreasonably small in relation to the business or
> transaction; or
>
> (2)    Intended to incur, or believed or reasonably should have
> believed that the debtor would incur, debts beyond the
> debtor's ability to pay as they becAme due.

N.J.S.A. § 25:2-25b.

174.    The evidence at trial demonstrates that the Open Receivables Transfers

were not in exchange for a reasonably equivalent value and were made at a time when the Debtor

was insolvent, thereby satisfying the above-cited requirements of both subsections (1) and (2) of

Section 25:225b of the NJUFTA.

175.    There was at least one creditor of the Debtor in existence as of the time of

the Open Receivables Transfers who, thus, could have avoided the Open Receivables Transfers

under the NJUFTA, that being Connecticut General. (See, ¶161, supra.)

176.    For the foregoing reasons, the Successor Trustee is entitled to the

avoidance of the Open Receivables Transfers under Section 544(b)(1) of the Bankruptcy Code.

177.    Accordingly, pursuant to Section U.S.C. § 550(a)(1), the Successor

Trustee may recover from Westchester Lace the value of the avoidable Open Receivables

Transfers.

## A.     <u>Westchester Lace is not Entitled to a Setoff</u>

178.     Westchester Lace alleges that it is entitled to a setoff of approximately $567,000 for amounts that it contends it was owed by the Debtor as of the Petition Date (the "Setoff Amount"). (Tr3 at p. 179, lines 16 -21; p. 180, lines 15 -22.) Westchester Lace, however, has not filed a proof of claim for the Setoff Amount. (Tr3 at p. 179, line 22 -p. 179, line 14.) Therefore, Westchester Lace has waived that claim. <u>In re</u> Enron Creditors Recovery Corp., 376 B.R. 442, 465 (Bankr. S.D.N.Y. 2007) ("Enron").

179.     Furthermore, Section 553 of the Bankruptcy Code ("Section 553"), which permits setoffs in bankruptcy to the extent that they are allowed under non-bankruptcy law, is permissive, and not mandatory. <u>In re</u> Lawson, 187 B.R. 6, 7-8 (Bankr. D. Idaho 1995). "'Its application, when properly invoked before a court, rests in the discretion of that court, which exercises such discretion under the general principles of equity.'" <u>Id.</u> (quoting U.S. v. Norton, 717 F.2d 767, 772 (3d Cir. 1987) (quoting 4 COLLIER ON BANKRUPTCY ¶ 553.02 at 553-11 (15th ed. 1983))); <u>See</u> also, <u>In re</u> Bennett Funding Group, Inc., 146 F.3d 136, 140 (2d Cir. 1998) (citing <u>In re</u> Bohack Corp. v. Borden, Inc., 599 F.2d 1160, 1165 (2d Cir. 1979).

180.     Courts have refused to permit setoff to a creditor where the creditor committed an inequitable, illegal or fraudulent act. <u>In re</u> Lawson, 187 B.R. at 8; <u>In re</u> Blanton, 105 B.R. 321, 337-38 (Bankr. E.D.Va. 1989). Such inequitable or fraudulent acts include those where the creditor converted the debtor's assets, <u>see, e.g.</u>, Windsor Communications Group, Inc. v. Havertown Printing Co. (<u>In re</u> Windsor Communications Group, Inc.) 79 B.R. 210 (E.D.Pa. 1987), or breached fiduciary duties owed to the debtor, or received unauthorized fraudulent transfers <u>see, e.g.</u>, Browner v. Rosen, 56 B.R. 214 (D.Mass. 1985); <u>Palmer v. Stokely</u>, 259 F. Supp. 776 (W.D.Okla. 1966).

181. Accordingly, because Westchester Lace, at the direction of its sole shareholder and President Edelson, who was also a director and fifty percent (50%) shareholder of the Debtor, committed inequitable and fraudulent acts as set forth, _supra_, and because Edelson breached fiduciary duties that he owed to the Debtor, Westchester Lace should not entitled to assert the Setoff Amount.

182. Moreover, even assuming, _arguendo_, that Westchester Lace was otherwise entitled to claim the Setoff Amount, Section 502(d) of the Bankruptcy Code mandates disallowance of such a claim where Westchester Lace has not paid to the Debtor's estate the aggregate amount of the avoided Misappropriation Transfers, the Open Receivables Transfers and the Discounted Sales Transfers (defined _supra_.) See _Enron_, 376 B.R. at 466 (citing _White v. Bradford (In re Tax Reduction Institute_), 148 B.R. 63, 76 (Bankr. D. Col. 1992), wherein that Court noted that **"in disallowing the claim of a creditor who has not paid to the estate the amount of any avoided transfer, [Section 502(d)] plainly contemplates that there will not be setoff of such claims against avoided transfers"**) (emphasis added).

183. Accordingly, the Successor Trustee is entitled to recovery against Westchester Lace in the amount of $133,886, representing the value of the goods sold and delivered by the Debtor to Westchester Lace which comprise the Open Receivables Transfers, together with interest thereon as calculated in the manner set forth in paragraphs 195-204, _infra_.

## XIV. THE DISCOUNTED SALES TRANSFERS SHOULD BE AVOIDED AS CONSTRUCTIVELY FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 544 AND SECTION 25:2-25B OF THE NEW JERSEY FRAUDULENT TRANSFER ACT, AND THE SUCCESSOR TRUSTEE IS ENTITLED TO RECOVER FROM WESTCHESTER LACE THE VALUE OF THE ASSETS FRAUDULENTLY TRANSFERRED

184.    As set forth above, the Debtor sold goods to Westchester Lace during the period February 12, 1996 through May 2, 1997 at discounts that were not given to other of the Debtor's customers for the same goods (the "Discounted Sales Transfers"). In general, there was a discount of ten to twenty-five percent (10-25%) on the total sales amount to Westchester Lace during this period, resulting in a total discount of approximately $15,000 to $22,000, of which $18,500 is the average. (See, ¶¶ 112-18, supra.)

185.    Pursuant to Section 544(b)(1) of the Bankruptcy Code, the Successor Trustee may avoid the Discounted Sales Transfers by showing that they could have been avoided by an unsecured creditor under the NJUFTA. Under Section 25:2-25b of the NJUFTA, the transfers are avoidable if they were made:

> Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> (1)    Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (2)    Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due.

N.J.S.A. § 25:2-25b.

186.    The evidence at trial demonstrates that the Discounted Sales Transfers were not in exchange for a reasonably equivalent value and were made at a time when the Debtor

was insolvent, thereby satisfying the above-cited requirements of both subsections (1) and (2) of Section 25:225b of the NJUFTA.

187.    There was at least one creditor of the Debtor in existence as of the time of the Discounted Sales Transfers who thus could have avoided the Discounted Sales Transfers under the NJUFTA, that being Connecticut General.  (See, ¶ 161, supra.)

188.    For the foregoing reasons, the Successor Trustee is entitled to the avoidance of the Discounted Sales Transfers under Section 544(b)(1) of the Bankruptcy Code.

189.    Accordingly, pursuant to Section U.S.C. § 550(a)(5), the Successor Trustee may recover from Westchester Lace the value of the avoidable Discounted Sales Transfers.

190.    Accordingly, the Successor Trustee is entitled to recovery against Westchester Lace in the amount of $18,500, representing the average value of the discount received by Westchester Lace on the Discount Sales Transfers, together with interest thereon as calculated in the manner set forth, in paragraphs 195-204, infra.


## XV.    EDELSON IS LIABLE FOR DAMAGES ARISING OUT OF HIS MULTIPLE BREACHES OF THE FIDUCIARY DUTIES HE OWED THE DEBTOR

191.    "Corporate directors have a fiduciary relationship with the corporation and its stockholders." Casey v. Brennan, 344 N.J. Super 83, 109, 780 A.2d 553, 568 (App. Div. 2001). New Jersey law demands the utmost fidelity of directors in dealing with a corporation and its stockholders. Id. (citing Daloisio v. Peninsula Land Co., 43 N.J. Super. 79, 88, 127 A.2d 885, 890 (App. Div. 1956)). The fiduciary duty owed by a director, officer and shareholder of a corporation to such corporation includes the obligation not to take action which would be

44

adverse to the corporation's interests. AYR Composition, Inc. v. Rosenberg, 261 N.J. Super. 495, 501, 619 A.2d 592, 595 (App. Div. 1993).

192.     Where a director, officer and shareholder of a corporation fraudulently transfers corporate assets in violation of the NJUFTA, he or she has breached his or her fiduciary duty to the corporation, and is personally liable for the full amount of the assets . Rosenberg, 261 N.J. Super. at 501-06, 619 A.2d at 595-98.

193.     Edelson, while fifty percent (50%) shareholder and a director of the Debtor, breached his fiduciary duties that he owed to the Debtor by:

> i.      appropriating the Debtor Assets for the benefit of Westchester Lace without paying the Debtor any consideration therefor;
>
> ii.     causing Westchester Lace to begin selling the inventory of the Debtor that was stored at Westchester Lace's facility and that was subject to HUB's security interest, on May 16, 1997, two days after the Petition Date, without any authorization from the Bankruptcy Court, the Debtor or HUB, thereby precluding HUB from conducting a commercially reasonable sale as required by the New Jersey Bulk Transfer Act and the New Jersey Uniform Commercial Code, in an attempt to gain the customers and business of the Debtor for the benefit of Westchester Lace and himself, to the detriment of the Debtor's estate.
>
> iii.    causing Westchester Lace to (i) cease selling its style goods to the Debtor in 1997, which the Debtor had, in turn, been reselling at a profit, and (ii) proceed to sell those goods to the customers of the Debtor directly, through the appropriation and use of the Debtor's Customer List, thereby benefiting Westchester Lace and himself to the detriment of the Debtor;
>
> iv.     hiring key sales employees of the Debtor, within days after the Petition Date, to begin performing for the benefit of Westchester Lace similar sales and other related functions that they had been performing for the Debtor, including the solicitation of former customers of the Debtor on behalf of Westchester Lace;

v.     causing Westchester Lace not to pay the Debtor for the amount of the Outstanding Accounts Receivable due from Westchester Lace for goods sold and delivered by the Debtor to Westchester Lace between February 12, 1996 through May 2, 1997; and

vi.    causing the Debtor to sell to Westchester Lace goods at a discount that was not given to other of the Debtor's customers for the same goods, thereby benefiting Westchester Lace and himself to detriment of the Debtor.

194.    Edelson is, therefore, liable to the Successor Trustee for the breaches of each of his aforesaid fiduciary duties as follows: (1) damages in the amount of $550,000 for the acts referred to in paragraph 193(i), (iii) and (iv), together with interest thereon as calculated in the manner set forth in paragraphs 195-204, infra, or alternatively, for damages in the amount of $234,230 for the acts referred to in paragraph 193(ii), together with interest thereon as calculated in the manner set forth in paragraphs 195-204, infra, (2) damages in the amount of $133,886 for the acts referred to in paragraph 193(v), together with interest thereon as calculated in the manner set forth in paragraphs 195-204, infra, and (3) damages in the amount of $18,500 for the acts referred to in paragraph 193(vi), together with interest thereon as calculated in the manner set forth in paragraphs 195-204, infra.

## XVI.  THE SUCCESSOR TRUSTEE IS ENTITLED TO PREJUDGMENT INTEREST ON HIS CLAIMS

195.    In addition to being awarded judgment on the respective above-enumerated amounts against the respective Remaining Defendants, the Successor Trustee is entitled to recover prejudgment interest on those awarded amounts.

196.    When awarding prejudgment interest, courts are to take into consideration:

> (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court.

Wickham Contracting Co., Inc. v. Local Union No. 3, Intern. Broth. of Elec. Workers, AFL-CIO, 955 F.2d 831, 834 (2nd Cir. 1992) (citations omitted). Full compensation to the estate for avoided transfers normally requires prejudgment interest to compensate for the value over time of the amount recovered. See Hirsch v. Steinberg (In re Colonial Realty Co.), 226 B.R. 513, 527 (Bankr. D. Conn. 1998). This is especially so where as here, the acts of malfeasance took place on the part of the Remaining Defendants commencing some eleven (11) years ago.

197.    Accordingly, to fully and fairly compensate the Debtor's estate, the Successor Trustee is entitled to recover prejudgment interest on the respective monetary amounts he is being awarded hereby (the "Damage Amounts").

## A.    The Successor Trustee Is Entitled to Recover Prejudgment Interest

198.    For the reasons set forth below, the Successor Trustee is entitled to collect prejudgment interest on the Damage Amounts calculated in the manner set forth in paragraphs 199-204, infra.

199.    The applicable rate of prejudgment interest on a claim is determined by the nature of the right asserted. Committee of Unsecured Creditors of Interstate Cigar Co., Inc. v. Interstate Distribution, Inc. (In re Interstate Cigar Co., Inc.), 890-81248-478, 2002 Bankr. LEXIS 781, at *8 (Bankr. E.D.N.Y. July 26, 2002) (citing Pereira v. Goldberger (In re Stephen Douglas, Ltd.), 174 B.R. 16, 19, 20 (Bankr. E.D.N.Y. 1994)). Because the respective Damage

Amounts being awarded hereby on the Successor Trustee's misappropriation claims and his fraudulent conveyance claims are predicated on New Jersey substantive law, New Jersey law is the proper source from which to determine the appropriate interest rates to be applied. See *In re Interstate Cigar Co., Inc.*, 2002 Bankr. LEXIS 781, at \*6. See also Pereira v. Private Brands (*In re Harvard Knitwear, Inc.*), 193 B.R. 389, 399 (Bankr. E.D.N.Y. 1996); *In re Stephen Douglas, Ltd.*, 174 B.R. at 22.

200.    Pursuant to New Jersey Court Rule ("Rule") 4:42-11(b), prejudgment interest on tort claims is calculated as follows:

> Except where provided by statute with respect to a public entity or employee, and except as otherwise provided by law, the court shall, in tort actions, including products liability actions, include in the judgment simple interest, calculated as hereafter provided, **from the date of the institution of the action or from a date 6 months after the date the cause of action arises, whichever is later**, provided that in exceptional cases the court may suspend the running of such prejudgment interest. Prejudgment interest shall not, however, be allowed on any recovery for future economic losses. **Prejudgment interest shall be calculated in the same amount and manner provided for by paragraph (a) of this rule** except that for all periods prior to January 1, 1988 interest shall be calculated at 12% per annum. The contingent fee of an attorney shall not be computed on the interest so included in the judgment.

(Rule 4:42-11(b) (emphasis added).)    As the Complaint in this Adversary Proceeding was filed on September 10, 1999, a date which is more than six (6) months subsequent to the date that the remaining tort claims against the Remaining Defendants arose, prejudgment interest on the Damage Amounts accrues commencing as of September 10, 1999.

201.    As set forth in Rule 4:42-11(b), prejudgment interest in tort cases is to be calculated in the same manner as post-judgment interest is calculated under Rule 4:42-11(a), which provides in pertinent part:

> For judgments not exceeding the monetary limit of the Special Civil Part at the time of entry, regardless of the court in which the action was filed: commencing January 2, 1986 and for each calendar year thereafter, the annual rate of interest shall equal the average rate of return, to the nearest whole or one-half percent, for the corresponding preceding fiscal year terminating on June 30, of the State of New Jersey Cash Management Fund (State accounts) as reported by the Division of Investment in the Department of the Treasury.

(Rule 4:42-11(a)(ii).)

202.   The monetary limit in the Special Civil Part is $15,000. (Rules Governing Practice in the Law Division, Special Civil Part, Rule 6:1-2.) Accordingly, prejudgment interest for this case, in which the Successor Trustee is entitled to recover judgment in an amount exceeding $15,000, is governed by Rule 4:42-11(a)(iii), which provides that post-judgment interest shall be calculated as follows:

> For judgments exceeding the monetary limit of the Special Civil Part at the time of entry: **in the manner provided for in subparagraph (a)(ii) of this Rule until September 1, 1996; thereafter, at the rate provided in subparagraph (a)(ii) plus 2% per annum.**

(Rule 4:42-11(a)(iii). (emphasis added.)

203.   The average rates of return of the State of New Jersey Cash Management Fund (State accounts) referred to in the above-cited Rules, as reported by the Division of Investment in the Department of the Treasury for the fiscal years terminating on June 30, 1998 through June 30, 2007, are as follows:

| | |
|------|------|
| 1998 | 5.5% |
| 1999 | 5.5% |
| 2000 | 5.0% |
| 2001 | 5.5% |
| 2002 | 6.0% |
| 2003 | 3.0% |
| 2004 | 2.0% |

|      |      |
|------|------|
| 2005 | 1.0% |
| 2006 | 2.0% |
| 2007 | 4.0% |
| 2008 | 5.5% |

(Website of the Division of Investment, Department of the Treasury, State of New Jersey,

available at: http://www.state.nj.us/treasury/doinvest/rate1.html.) Pursuant to Rule 4:42-

11(a)(iii) then, the pertinent prejudgment interest rates are to be calculated at 2% per annum in

excess of the annual rates of return set forth above in this paragraph.

204.    Pursuant to the foregoing, the Successor Trustee is entitled to prejudgment

interest on the respective Damage Amounts awarded in his favor against the respective

Remaining Defendants, commencing as of September 10, 1999, and calculated in the manner set

forth in this Subsection A.

## XIII.    CONCLUSION

205.    Based upon the foregoing Findings of Fact and Conclusions of Law, the

Successor Trustee is entitled to recover judgment against the Remaining Defendants as follows:

A.    Against Defendant Westchester Lace, (i) $550,000 respecting the Misappropriation and/or the Misappropriation Transfers, or alternatively, $234,230 respecting the Inventory Sale Malfeasance, together with prejudgment interest thereon from September 10, 1999 calculated in the manner set forth in paragraphs 195-204, supra, (ii) $133,886 respecting the Outstanding Accounts Receivable and/or the Open Receivables Transfers, together with prejudgment interest thereon from September 10, 1999, calculated in the manner as set forth in paragraphs 195-204, supra, and (iii) $18,500 respecting the Discounted Sales Transfers, together with prejudgment

50

interest thereon from September 10, 1999, calculated in the manner set forth paragraphs 195-204, supra.

B.  Against Defendant Edelson, (i) $550,000 respecting his breaches of fiduciary duty in connection with the Misappropriation and/or the Misappropriation Transfers, or alternatively, $234,230 respecting his breaches of fiduciary duty in connection with the Inventory Sale Malfeasance, together with prejudgment interest thereon from September 10, 1999, calculated in the manner set forth in paragraphs 195-204, supra, (ii) $133,886 respecting his breaches of fiduciary duty in connection with the Outstanding Accounts Receivable and/or Open Receivables Transfers, together with prejudgment interest thereon from September 10, 1999, calculated in the manner set forth in paragraphs 195-204, supra, and (iii) $18,500 respecting his breaches of fiduciary duty in connection with the Discounted Sales Transfers, together with prejudgment interest thereon from September 10, 1999, calculated in the manner set forth in paragraphs 195-204, supra.

Dated:  New York, New York
April 17, 2008

BRYAN CAVE LLP

By: /s/ Robert A. Wolf
Robert A. Wolf (RW 3419)
Omar A. Shakoor (OS 4913)
1290 Avenue of the Americas
New York, New York 10104
212-541-2000 (phone)

*General Counsel for Plaintiff*
*Robert L. Geltzer, as Chapter 7 Successor*
*Trustee of M. Silverman Laces, Inc.*